Filed 6/15/16  Freuler v. Freuler CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| KARIN J. FREULER, as Cotrustee, etc., | H041000 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 1-13-PR172886) |
| v. | |
| KATHLEEN M. FREULER, as Cotrustee, etc., | |
| Defendant and Respondent. | |

## I.  INTRODUCTION

The parents of plaintiff Karin J. Freuler and defendant Kathleen M. Freuler[1] executed a revocable trust in which the parents were initially cotrustees.  After the father died and the mother resigned as trustee, Kathleen became the sole trustee pursuant to the terms of the trust.  Kathleen later purportedly appointed Karin as cotrustee, but Kathleen eventually revoked the appointment.

Karin filed a petition seeking a determination that she was cotrustee of the trust, and that the trust did not give Kathleen the power to unilaterally remove her.  Karin also sought a determination that Kathleen had breached various duties as trustee and sought removal of Kathleen as trustee.  After briefing and hearing argument from the parties, the

---

[1] Since the Freuler family members have the same surname, we will refer to them by their first names for purposes of clarity and not out of disrespect.

probate court determined that it was appropriate to bifurcate the issue of the trust's application to the purported appointment of Karin as cotrustee and the revocation of that appointment. The court also determined that extrinsic evidence was not necessary to the resolution of the issue. Ultimately the court concluded that Kathleen's appointment of Karin as cotrustee was invalid and void because the trust provided for the appointment of a successor trustee but not a cotrustee.

On appeal from the order determining that her appointment as cotrustee was invalid, Karin contends that her appointment was valid because the trust instrument provides for the appointment of "successor co-trustees." She also argues that the probate court erred by failing to hold an evidentiary hearing to consider extrinsic evidence regarding this construction of the trust instrument. Karin further contends that the briefing procedure utilized by the court was improper because the court did not comply with the requirements for a summary judgment motion, the court's ruling was based on a ground that was not raised in Kathleen's initial brief, and the court ruled on an issue that was broader than the issue that it had ordered the parties to brief.

For reasons that we will explain, we will affirm the order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Trust*

Raymond G. Freuler and Jeanne D. Freuler, a married couple, had two daughters, plaintiff Karin and defendant Kathleen, and a son, Raymond G. Freuler, Jr. (Raymond Jr.). Parents Raymond and Jeanne created the "1998 Freuler Family Trust." The trust instrument provided that Raymond and Jeanne were cotrustees.

Raymond died in October 2001. Jeanne became the sole trustee upon Raymond's death pursuant to the trust instrument.

The trust instrument provides that after the first spouse dies, the trust will be divided into "separate Trusts," specifically the "Surviving Spouse's Trust," the "Deceased Spouse's Trust," and the "Marital Trust." The Surviving Spouse's Trust

2

includes the surviving spouse's separate property and share of community property that is part of the trust estate. The Deceased Spouse's Trust includes assets "which have the highest value that can be allocated to such a trust without producing any federal estate tax without using the marital deduction." The Marital Trust contains any other assets of the trust estate that have not been allocated to the other two trusts. The trust instrument generally provides for quarterly distributions to the surviving spouse from each of the three separate trusts. The trust instrument also generally provides that the surviving spouse may amend or revoke the Surviving Spouse's Trust but not the Deceased Spouse's Trust.

After the death of the surviving spouse, and to the extent assets remain in the Surviving Spouse's Trust and the Marital Trust, those assets will become part of the Deceased Spouse's Trust. Kathleen, Karin, and Raymond Jr. are the beneficiaries of the Deceased Spouse's Trust. Raymond Jr. died in 2010 or 2011.

**B. *Change of Trustee***

**1. Resignation of Jeanne and succession of daughter Kathleen as trustee pursuant to section 2.1 of the trust instrument**

On September 13, 2012, Jeanne executed documents stating that she was resigning as the sole trustee of the 1998 Freuler Family Trust, the Surviving Spouse's Trust, the Marital Trust, and the Deceased Spouse's Trust. The trust instrument states the following regarding trustees:

"Section 2.1 <u>Named Trustees</u> [¶] We [Raymond and Jeanne] shall initially act as Co-Trustees. If either of us is unable or unwilling to act as Trustee, whether by reason of death, mental or physical incapacity . . . , then the other shall act as sole Trustee. If neither of us can or desires to act as Trustee, then Kathleen M. Freuler shall act as Trustee, followed if necessary by Karin J. Freuler and then Raymond G. Freuler, Jr."

Accordingly, following Jeanne's resignation, daughter Kathleen became the trustee.

## 2. Kathleen's purported designation of sister Karin as cotrustee pursuant to section 2.2 of the trust instrument

The trust instrument allows the designation of a trustee as follows:

"Section 2.2 Designation by named Trustee [¶] Notwithstanding Section 2.1, a person named in that Section who is then acting as Trustee (including either [Raymond or Jeane] or both of us) may designate a successor Trustee to act when he becomes unable or unwilling to act as Trustee. The persons designated may be a successor Trustee named above or any other natural person or entity, such as a bank or trust company. If one of the persons named above makes such a designation, he or a successor to him named above may later revoke that designation and either resume his duties as Trustee or designate some other person or entity to so act. All such designations or revocations shall be made by written instrument and shall be effective when a copy of that instrument is delivered to the beneficiaries of the Trust for which the new Trustee is designated."

In October 2012, in an attempt to make Karin a cotrustee, Kathleen and Karin executed a document entitled "Designation of Trustees," which their mother Jeanne signed about a month later. The document states: "I, Kathleen M. Freuler, being the currently acting trustee of the 1998 Freuler Family Trust created by Raymond G. Freuler and Jeanne D. Freuler by Declaration of Trust dated February 25, 1998, having the power to do so pursuant to Part 2, Section 2.2 hereby make the following designation: [¶] From and after the date of this Designation, Karin J. Freuler and I shall act as trustees of the 1998 Freuler Family Trust and each of its subtrusts, that is, the 1998 Freuler Family Trust–Surviving Spouse's Trust, the 1998 Freuler Family Trust–Deceased Spouse's Trust and the 1998 Freuler Family Trust–Marital Trust. Either of us acting alone or both of us acting together may do any act or exercise any power that the trustee may do under the Declaration of Trust or law."

A few months later, a petition by Kathleen, Karin, and their mother Jeanne regarding the Marital Trust was granted by Orange County Superior Court. The court's

4

order apparently resulted in a portion of the assets of the Marital Trust being distributed to Kathleen and Karin.

### 3. Revocation of designation of Karin as cotrustee

The record reflects that Kathleen and Karin were unable to work together as cotrustees. On July 11, 2013, Kathleen executed a document entitled "Revocation of Co-Trustee and Appointment of Successor Trustee." The document states that Kathleen "appointed" Karin as cotrustee "pursuant to the power granted [Kathleen] in Section 2.2 of the Trust," and that pursuant to section 2.2 Kathleen "has the right to revoke her designation of [Karin] as Co-Trustee of the Trust and appoint another person or entity to act as Co-Trustee or successor Trustee." The document further states that Kathleen "hereby revokes the designation of [Karin] as Co-Trustee of the Trust and appoints First American Trust, FSB as Co-Trustee of the Trust to act with [Kathleen]. [¶] Furthermore, [Kathleen] hereby appoints First American Trust, FSB as the sole successor Trustee of the Trust upon the death, incapacity or resignation of [Kathleen]." (Some capitalization omitted.)

### C. *Karin's Petition Regarding the Trust and Kathleen's Written Objection*

On July 12, 2013, Karin filed a verified petition seeking a determination that she was cotrustee of the trust, and that the trust did not give Kathleen the power to unilaterally remove her. Karin also sought a determination that Kathleen had breached various duties as trustee and sought removal of Kathleen as trustee.

On November 5, 2013, Kathleen filed a verified written objection to Karin's petition. Kathleen characterized Karin as a "subsequent Trustee appointment" under section 2.2 of the trust and contended that she (Kathleen) had the power to revoke Karin's appointment pursuant to section 2.2. Kathleen also denied that she had engaged in any misconduct with respect to the trust.

On November 6, 2013, Jeanne filed a declaration in support of Kathleen's objection to Karin's petition. Jeanne stated that "[u]nder the terms of the Trust," she and

5

her husband Raymond nominated their daughter Kathleen as successor trustee. Jeanne further stated in her declaration: "<u>Only</u> in the event that Kathleen was unable to serve as trustee would our daughter Karin . . . serve as trustee." Jeanne explained that Kathleen approached her (Jeanne) about Karin "helping . . . to serve as co-trustee," and Jeanne "reluctantly agreed." Thereafter, "tension" developed between the two sisters, and Jeanne "support[ed] reinstating [Kathleen] as sole trustee."

### D. *Briefing Regarding Validity of Cotrustee Revocation*

In a written status conference statement, Kathleen proposed that the court set a hearing date with a briefing schedule for the "purely legal issue" of the validity of the revocation of Karen's appointment as cotrustee. At the status conference, Karin opposed Kathleen's request. Karin contended that there were factual issues including regarding "what the trust means." Karin contended that extrinsic evidence was admissible and that an evidentiary hearing was needed.

The probate court ultimately set a briefing schedule for a hearing on whether the matter could be resolved without extrinsic evidence. The court stated: "I'm inclined to . . . have the parties brief the threshold issue which is, does the validity of revocation in fact present a purely legal issue that can be resolved without extrinsic evidence? And I'll give you a hearing date which will just be for argument on the briefs that you've submitted on those issues and then depending how that comes out, we'll either have a more fully blown evidentiary hearing with extrinsic evidence or it's going to be resolved as a purely legal issue." The parties agreed that Kathleen would file an opening brief, Karin would file opposition, and Kathleen would file a reply brief. The court ordered the briefs to be filed in accordance with the regular time frames set forth for motions. The court indicated that it would hear "argument on the threshold issue" on February 6, 2014.

### 1. **Kathleen's opening brief**

In her opening brief filed in the probate court on January 14, 2014, Kathleen relied on the following sentence in section 2.2 of the trust instrument as providing the authority

for her to revoke the cotrustee appointment of Karin: "If one of the persons named above makes such a designation, he or a successor to him named above may later revoke that designation and either resume his duties as Trustee or designate some other person or entity to so act." Kathleen argued that the provision must be construed so as to give effect to the settlors' intentions, that the provision was clear and not susceptible to more than one meaning, and that the court could construe the provision as a matter of law without extrinsic evidence. Kathleen contended that "[w]hether Karin was a 'successor Trustee' or a 'co-Trustee' is irrelevant."

## 2. Karin's responding brief

Karin filed a written response on January 24, 2014, contending that under the terms of the document designating her as cotrustee and executed by all parties, and pursuant to the Probate Code, she was a cotrustee with equal powers. She argued that section 2.2 did not give Kathleen the unilateral power to remove her as cotrustee. Rather, section 2.2 pertained to the designation of a successor trustee where the acting trustee is unwilling or unable to act, and the ability of the former acting trustee to later resume the role when the person is willing and able to act. Karin contended that the trust was actually silent on the issue of whether she could be unilaterally removed as cotrustee by Kathleen under the circumstances of the case. Thus, evidence was needed in order to properly construe the trust, and an evidentiary hearing was required.

Karin further emphasized that the question pending before the court was "whether the Court may bifurcate the case and set a further pleading and hearing schedule, without evidence, to adjudicate Kathleen's single material contention that the language of the Trust supports her actions." Karin contended that bifurcation was not warranted under Code of Civil Procedure section 598. She further argued that an evidentiary hearing was necessary, but that if the court were to determine otherwise, she "should nonetheless be entitled to brief the issue and have it heard in a subsequent hearing."

7

### 3. Kathleen's reply brief

In a written reply filed January 30, 2014, Kathleen contended that the court had invited briefing on two issues: (1) whether extrinsic evidence was needed to construe section 2.2 of the trust as permitting an existing trustee to revoke the appointment of a successor trustee, and (2) if not, whether Kathleen's revocation of Karin's appointment as cotrustee was valid. Kathleen argued that Karin failed to present any circumstances that would suggest section 2.2 meant anything other than "what its plain language says" and thus no evidentiary hearing was necessary.

Kathleen also addressed Karin's argument that section 2.2 pertained to the revocation of a *successor* trustee and that section 2.2 did not authorize the revocation of Karin's *cotrustee* designation. Kathleen argued:

"[B]y Karin's own reasoning, [Kathleen] had no power to appoint Karin as a 'co-Trustee' in the first place because Section 2.2 only gave [Kathleen] power to appoint a 'successor Trustee.' So taking Karin's argument to its logical extreme, the Court should void her appointment as 'co-Trustee' because such appointment was unauthorized.

"But the Court does not need to do that, for as we know the Court must construe the trust in a manner that serves 'the intent of the trustor' and that will 'give every expression some effect, rather than one that will render any of the expressions inoperative.' Here, the clear intent of the Revocation Provision [in section 2.2] is to preserve an appointed Trustee's power to revoke his or her later appointment of another Trustee. Whether that later-appointed Trustee is a 'successor Trustee' or a 'co-Trustee' is immaterial, and to strictly apply such a distinction to the present circumstances would subvert the intent of the trustor and render the Revocation Provision [in section 2.2] inoperative." (Fns. omitted.)

### E. *The February 6, 2014 Hearing*

At the February 6, 2014 hearing on the matter, Kathleen, Karin, and their mother Jeanne each appeared through separate counsel. Near the outset of the hearing, the

8

probate court stated, "The clear reading of [section] 2.2 of the trust says nothing about a cotrustee." The court asked whether the word "cotrustee" appeared anywhere in the trust instrument. Kathleen responded in the negative, and Karin indicated that the term appeared in the trust instrument, but in a separate context.

The court believed there was "no authority in the trust itself for Kathleen to name Karin as cotrustee," and asked, "Shouldn't I just find it to be void in the inception and it never should have happened in the first place?" Karin argued that the trust authorized Jeanne to appoint successor trustees "in the plural," and that Jeanne had done so by appointing Karin and Kathleen. Jeanne disagreed, arguing that Kathleen did not have the power to appoint Karin as cotrustee and that the court should "void" the entire "transaction." Kathleen believed that "voiding the initial appointment may be one approach" to resolving the matter but expressed concern about the validity of transactions that had taken place when the sisters were acting as cotrustees.

Later, upon inquiry by the probate court, the parties addressed whether, if Karin was validly appointed as cotrustee, Kathleen had the power under section 2.2 to revoke the appointment. The court eventually stated that its tentative ruling was to find that Kathleen did not have the authority to appoint Karin as cotrustee. The court asked the parties about the implication for transactions that had already taken place.

Ultimately, the probate court stated that "the threshold issue really is bifurcation." The court determined that, pursuant to Code of Civil Procedure section 598, it was "efficient and appropriate" to bifurcate the issue of whether Kathleen had the power to revoke the cotrustee status of Karin. The court stated that its finding was that Kathleen "didn't have the power to make the appointment in the first place, and so the power of revocation is sort of moot."

9

**F.** *The Trial Court's March 7, 2014 Order*

In a written order signed and filed March 7, 2014,[2] the probate court explained that it had conducted a hearing to address the application of section 2.2 of the trust to the purported appointment of Karin as cotrustee and the revocation of that appointment. The court ruled that the matter was "appropriate for bifurcation," and that it "may consider this matter without the need for extrinsic evidence." The court determined that the cotrustee appointment was "*invalid and void* since Section 2.2 of the Trust does not provide for the appointment of a 'Co-Trustee' and only provides for appointment of a 'successor Trustee.' " The court confirmed Kathleen as the sole trustee, based on section 2.1 of the trust and Jeanne's resignation. Lastly, the court confirmed all transactions entered into by Kathleen and Karin in their purported capacity as cotrustees. The court explained that the public had the right to rely on "the apparent Co-Trusteeship" and that there was no need to disturb the validity of those transactions.[3]

## III.  DISCUSSION

Karin first contends that her appointment as cotrustee was valid because the trust instrument gives Kathleen the power to appoint "successor co-trustees," and the probate court erred by failing to hold an evidentiary hearing to consider extrinsic evidence regarding this construction of the trust instrument. Karin also argues that the briefing procedure utilized by the probate court was improper. She contends that the briefing procedure utilized by the court did not comply with the requirements for a summary judgment motion, that in making its ruling the court relied on a ground that was not

---

[2] The record on appeal contains an earlier-signed (February 2014) but later-filed (March 12, 2014) order by the trial court that appears nearly identical to the March 7, 2014 order. The earlier-signed/later-filed order does not include as attachments the exhibits that are referenced in the order, and it does not appear from the record on appeal that this order was served on Karin.

[3] Karin has appealed from the March 7, 2014 order. The order is appealable. (Prob. Code, §§ 1304, subd. (a), 17200.)

10

raised in Kathleen's initial brief, and that the court ruled on an issue that was broader than the issue that it had ordered the parties to brief.

Kathleen responds that the probate court correctly construed the trust instrument to preclude the appointment of a cotrustee, and that the court properly refused to consider extrinsic evidence in making this determination. Kathleen further contends that Karin did not have the right to an evidentiary hearing, that the court's briefing process was proper, that many of Karin's procedural objections are waived, and that Karin fails to demonstrate prejudice due to the court's purported procedural errors.

**A. *Construction of the Trust, Whether Extrinsic Evidence Was Necessary, and an Whether an Evidentiary Hearing Was Required***

Karin first contends that the trust instrument gives Kathleen the power to appoint "successor co-trustees," and that the probate court erred by failing to hold an evidentiary hearing to consider extrinsic evidence regarding this construction of the trust instrument. We will set forth the general rules of interpreting a trust and then consider Karin's specific contentions.

### 1. Trust interpretation

"A trust is created by a manifestation of intention of the settlor to create a trust, trust property, a lawful trust purpose, and an identifiable beneficiary. [Citations.]" (*Chang v. Redding Bank of Commerce* (1994) 29 Cal.App.4th 673, 684.) " '[T]he primary rule in construction of trusts is that the court must, if possible, ascertain and effectuate the intention of the trustor or settlor.' [Citation.] 'The intention of the transferor as expressed in the [trust] instrument controls the legal effect of the dispositions made in the instrument.' (Prob. Code, §§ 21101, 21102.)" (*Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1206.) "The words of an instrument are to receive an interpretation that will give every expression some effect, rather than one that

11

will render any of the expressions inoperative." (Prob. Code, § 21120.)[4] "All parts of an instrument are to be construed in relation to each other and so as, if possible, to form a consistent whole. If the meaning of any part of an instrument is ambiguous or doubtful, it may be explained by any reference to or recital of that part in another part of the instrument." (§ 21121.)

" 'In interpreting a document such as a trust, it is proper for the trial court in the first instance and the appellate court on de novo review to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect. [Citation.] Thus, extrinsic evidence as to the circumstances under which a written instrument was made is admissible to interpret the instrument, although not to give it a meaning to which it is not reasonably susceptible. [Citation.]' " (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 73 (*Ike*).) "An ambiguity in a written instrument exists when, in light of the circumstances surrounding the execution of the instrument, ' "the written language is fairly susceptible of two or more constructions." [Citations].' [Citation.]" (*Id.* at p. 74.)

" ' " 'The interpretation of a written instrument, including a . . . declaration of trust, presents a question of law unless interpretation turns on the competence or credibility of extrinsic evidence or a conflict therein. Accordingly, a reviewing court is not bound by the lower court's interpretation but must independently construe the instrument at issue. [Citations.]' [Citations.]" [Citation.]' " (*Ike*, *supra*, 61 Cal.App.4th at p. 73.) Whether the instrument is ambiguous is also a question of law, and an appellate court independently reviews the instrument to determine whether ambiguity exists. (See *Colonial Ins. Co. v. Montoya* (1986) 184 Cal.App.3d 74, 82 (*Colonial*).)

---

[4] All further statutory references are to the Probate Code unless otherwise indicated.

12

In this case, we understand Karin to contend that the trust instrument reflects the intent of the settlors, Raymond and Jeanne, to allow for cotrustees. Among other provisions, Karin points to section 9.13 of the trust instrument which states: "Section 9.13 <u>Construction</u> [¶] The following principles shall govern the interpretation of the meaning of this instrument: [¶] (a) The masculine, feminine, or neuter gender, and the singular or plural number, shall each include the other whenever the context so indicates." Karin contends that based on section 9.13(a) and certain other provisions, "the settlors were obviously using the term, Trustee, to include the singular or plural (which are co-trustees)."

It is apparent from the trust instrument that the settlors, Raymond and Jeanne, contemplated the existence of cotrustees, as they expressly designated themselves to "initially act as Co-Trustees" in section 2.1. However, they also contemplated the possibility that there might only be one trustee. For example, section 2.1 provides that if one of them is unwilling to act as trustee, then the other spouse will "act as sole Trustee." Section 2.1 also provides that if they both do not want to act as trustee, then *one* of their children, in the order designated in the trust instrument, will "act as Trustee." Further, as Karin points out, other provisions in the trust are drafted to accommodate the possibility that there might be cotrustees, such as parents Raymond and Jeanne, or sole trustees, such as one of their children.

The relevant issue, however, is whether a provision in the trust instrument authorizes Kathleen, as trustee, *to appoint a cotrustee.* "A trustee's powers include those specified in the trust instrument, those conferred by statute, and those needed to satisfy the reasonable person and prudent investor standards of care in managing the trust. [Citations.]" (*Moeller v. Superior Court* (1997) 16 Cal.4th 1124, 1129, fn. omitted.) "Thus, in general, trustees are bound by the terms of the trust and possess only that authority conferred upon them by the trust. [Citations.]" (*Crocker-Citizens National Bank v. Younger* (1971) 4 Cal.3d 202, 211.)

13

In this case, Karin contends that section 2.2 permits Kathleen's appointment of "successor co-trustees," and thus Kathleen could properly designate Karin as a cotrustee. We are not persuaded by Karin's argument that section 2.2 is susceptible to a construction that Kathleen had the power to designate Karin as a cotrustee serving simultaneously with Kathleen.

To reiterate, sections 2.1 and 2.2 state as follows:

"Section 2.1 <u>Named Trustees</u>  [¶]  We [Raymond and Jeanne] shall initially act as Co-Trustees.  If either of us is unable or unwilling to act as Trustee, whether by reason of death, mental or physical incapacity . . . , then the other shall act as sole Trustee.  If neither of us can or desires to act as Trustee, then Kathleen M. Freuler shall act as Trustee, followed if necessary by Karin J. Freuler and then Raymond G. Freuler, Jr.

"Section 2.2 <u>Designation by named Trustee</u>  [¶]  Notwithstanding Section 2.1, a person named in that Section who is then acting as Trustee (including either or both of us) may designate a successor Trustee to act when he becomes unable or unwilling to act as Trustee.  The persons designated may be a successor Trustee named above or any other natural person or entity, such as a bank or trust company.  If one of the persons named above makes such a designation, he or a successor to him named above may later revoke that designation and either resume his duties as Trustee or designate some other person or entity to so act.  All such designations or revocations shall be made by written instrument and shall be effective when a copy of that instrument is delivered to the beneficiaries of the Trust for which the new Trustee is designated."

It is apparent from section 2.1 that Raymond and Jeanne contemplated cotrustees as long as both of them were willing and able to serve as such.  If neither one was willing or able to serve, as occurred in this case, then section 2.1 specified the order in which each of their children would have the opportunity to serve as sole trustee.

Further, it is apparent that section 2.2 was intended to provide for a *successor* trustee when the then-acting trustee no longer acted as trustee.  The language of

14

section 2.2 is not reasonably susceptible to Karin's construction that a then-acting trustee could designate a *cotrustee*, such that *both* people were serving as trustee at the same time. The first sentence of section 2.2 states that a person "then acting as Trustee . . . may designate a successor Trustee to act when he [or she] *becomes unable or unwilling to act as Trustee*." (Italics added.) After the then-acting trustee "makes such a designation, he [or she] . . . may later revoke that designation and either *resume* his [or her] duties as Trustee *or* designate *some other person or entity to so act*." (Italics added.) Section 2.2 therefore clearly contemplates that the then-acting trustee *cease* acting in that role upon the newly-designated successor trustee stepping in and *resume* that role only upon revocation of the designation of the successor trustee.

In her reply brief on appeal, Karin argues that "unwillingness to act . . . is one of degree," and that an individual may be "unwilling to act alone" as trustee but "willing to act as a co-trustee." We are not persuaded by Karin's proposed construction of the trust instrument. Section 2.2 pertains to the designation of a "successor" trustee, which necessarily implies that the trustee has stepped into the role *after* the prior trustee stops acting in that role, as opposed to two trustees acting *concurrently*.

In sum, none of the language identified by Karin in the trust instrument is reasonably susceptible to the interpretation that Kathleen had the power to designate a cotrustee, nor does any of the language identified by Karin in the trust instrument otherwise reflect an intent by the settlors to provide a trustee with the power to designate a cotrustee. To the contrary, the trust expressly provides that each child will individually act as trustee in a specified order (that is, "Kathleen M. Freuler shall act as Trustee, followed if necessary by Karin J. Freuler and then Raymond G. Freuler, Jr."), and that a successor may be designated if the trustee is unable or unwilling to act.

15

## 2. Extrinsic evidence

Karin contends that the probate court should have provided her with the opportunity to present extrinsic evidence regarding her construction of the trust instrument that Kathleen had the power to appoint successor co-trustees.

As we stated above, " 'extrinsic evidence as to the circumstances under which a written instrument was made is admissible to interpret the instrument.' " (*Ike*, *supra*, 61 Cal.App.4th at p. 73.)  In *Estate of Russell* (1968) 69 Cal.2d 200 (*Russell*), the California Supreme Court set forth the rules for extrinsic evidence and the interpretation of a will. Those rules are pertinent to the interpretation of the trust instrument in this case. (*Citizens Business Bank v. Carrano* (2010) 189 Cal.App.4th 1200, 1205 (*Citizens Business Bank*).)

The *Russell* court explained that "extrinsic evidence is admissible 'to explain any ambiguity arising on the face of a will, or to resolve a latent ambiguity which does not so appear.' [Citations.]" (*Russell*, *supra*, 69 Cal.2d at pp. 206-207, fn. omitted.)  Ambiguity exists "when, in the light of the circumstances surrounding the execution of an instrument, 'the written language is fairly susceptible of two or more constructions.' [Citations.]" (*Id.* at pp. 211-212.)  An uncertainty that appears on the face of a will is a patent ambiguity.   (*Id.* at p. 207.)  "A latent ambiguity is one which is not apparent on the face of the will but is disclosed by some fact collateral to it.  [Citations.]" (*Ibid.*) "Typically, latent ambiguities arise where two persons or things answer the description of a bequest, or where there is a mistaken description and one or more persons match a portion of the bequest.  [Citation.]" (*Citizens Business Bank, supra,* 189 Cal.App.4th at p. 1205; accord, *Russell*, *supra*, at p. 207.)

The *Russell* court held that "it cannot always be determined whether the will is ambiguous or not until the surrounding circumstances are first considered." (*Russell*, *supra*, 69 Cal.2d at p. 213.)  The court explained that, "[i]n order to determine initially whether the terms of any written instrument are clear, definite and free from ambiguity

16

the court must examine the instrument in the light of the circumstances surroundings its execution so as to ascertain what the parties meant by the words used. Only then can it be determined whether the seemingly clear language of the instrument is in fact ambiguous. 'Words are used in an endless variety of contexts. Their meaning is not subsequently attached to them by the reader but is formulated by the writer and can only be found by interpretation in the light of all the circumstances that reveal the sense in which the writer used the words. The exclusion of parol evidence regarding such circumstances merely because the words do not appear ambiguous to the reader can easily lead to the attribution to a written instrument of a meaning that was never intended.' [Citation.] 'The court must determine the true meaning of the instrument in the light of the evidence available. It can neither exclude extrinsic evidence relevant to that determination nor invoke such evidence to write a new or different instrument.' (. . . [S]ee also Corbin, *The Interpretation of Words and the Parol Evidence Rule* (1965) 50 Cornell L.Q. 161, 164: '[When] a judge refuses to consider relevant extrinsic evidence on the ground that the meaning of written words is to him plain and clear, his decision is formed by and wholly based upon the completely extrinsic evidence of his own personal education and experience' . . . .)" (*Id.* at pp. 208-209, italics omitted.)

The *Russell* court thus stated that it was "self-evident that in the interpretation of a will, a court cannot determine whether the terms of the will are clear and definite in the first place until it considers the circumstances under which the will was made so that the judge may be placed in the position of the testator whose language he is interpreting. [Citation.] Failure to enter upon such an inquiry is failure to recognize that the 'ordinary standard or "plain meaning," is simply the meaning of the people who did *not* write the document.' [Citation.]" (*Russell, supra*, 69 Cal.2d at pp. 210-211, fn. omitted.)

In sum, the *Russell* court "made clear that extrinsic evidence could be used not only to resolve a patent ambiguity, but also *to identify a latent ambiguity*." (*Estate of Dye* (2001) 92 Cal.App.4th 966, 978 (*Dye*).) "Accordingly, '[e]ven if a contract appears

17

unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible.' [Citation.] 'The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' [Citation.]" (*Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 (*Dore*).)

In *Russell*, the California Supreme Court determined that extrinsic evidence was "properly considered in order to ascertain what testatrix meant by the words of the will, including the words: 'I leave everything I own Real & Personal to Chester H. Quinn & Roxy Russell.' " (*Russell*, *supra*, 69 Cal.2d at p. 214.) Specifically, extrinsic evidence was properly admitted "to raise and resolve the latent ambiguity as to Roxy Russell and ultimately to establish that Roxy Russell was a dog." (*Ibid.*)

However, the *Russell* court also stated that "extrinsic evidence as to the circumstances under which a written instrument was made is ' "admissible to interpret the instrument, but not to give it a meaning to which it is not reasonably susceptible" [citation], and it is the instrument itself that must be given effect. [Citations.]' [Citation.]" (*Russell*, *supra*, 69 Cal.2d at p. 211, fn. omitted.) In other words, "an ambiguity, whether patent or latent, must reside *in* the will. '[T]he court must attempt to ascertain the intent of the testator by examining the will as a whole and the circumstances surrounding its execution.' [Citations.] A court cannot ' "invoke [extrinsic] evidence to write a new or different instrument." ' (*Russell*, *supra,* 69 Cal.2d at p. 209.)" (*Dye*, *supra*, 92 Cal.App.4th at p. 978.) Thus, as one appellate court has explained, "extrinsic evidence cannot be used to show that when the parties said 'Bunker Hill Monument' they meant 'the Old South Church' or that when they said 'pencils' they really meant 'car batteries.' [Citations.]" (*Curry v. Moody* (1995) 40 Cal.App.4th 1547, 1554 (*Curry*).)

18

Thus, " '[t]he decision whether to admit parol [or extrinsic] evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step--interpreting the [instrument]. [Citation.]' " (*Estate of Kaila* (2001) 94 Cal.App.4th 1122, 1133 (*Kaila*).)

The probate court in this case sought briefing from the parties regarding whether the validity of Kathleen's action in revoking Karin as trustee "present[ed] a purely legal issue that can be resolved without extrinsic evidence." We agree with Karin that, as a general legal proposition, extrinsic evidence is admissible to identify, as well as to resolve, an ambiguity in a written instrument. (*Russell*, *supra*, 69 Cal.2d at pp. 206-212; *Dore*, *supra,* 39 Cal.4th at p. 391; *Dye*, *supra*, 92 Cal.App.4th at 978; *Kaila*, *supra*, 94 Cal.App.4th at p. 1135 ["extrinsic evidence is admissible to determine if an ambiguity exists and to interpret" a clause in a will].)

In this particular case, however, Karin failed to identify in the trust instrument a patent ambiguity, which would make extrinsic evidence admissible to resolve such an ambiguity. (See *Russell*, *supra*, 69 Cal.2d at p. 206.) She also failed to identify a latent ambiguity, or articulate the nature of the extrinsic evidence that would establish a latent ambiguity, such that the extrinsic evidence would show that the language of the trust instrument was reasonably susceptible to more than one possible meaning. (*Dore*, *supra,* 39 Cal.4th at p. 391.)

On appeal, Karin primarily relies on section 2.2, regarding the power of a trustee to designate a successor, and section 9.13(a), regarding the singular including the plural, to contend that Kathleen had the authority to appoint a cotrustee. As we have explained, however, the language of the trust instrument is not reasonably susceptible to this

19

construction.  In fact, the language of the trust is expressly to the contrary, that is, only one sibling may serve as trustee at a time, and a trustee must stop acting as trustee in order for a designated successor trustee to assume that role.

In the absence of Karin identifying language in the trust instrument that is reasonably susceptible to the interpretation that a trustee has the power to appoint a cotrustee, and in the absence of her persuasively articulating at least a theory as to what type of extrinsic evidence would support this construction of any specifically-identified trust language, Karin failed to demonstrate that extrinsic evidence was relevant and admissible in this case.  Moreover, *even assuming* Karin could produce extrinsic evidence that Raymond and Jeanne *intended* for a trustee serving after them to have the ability to appoint a cotrustee, and *even if* Karin has evidence that the family and various attorneys *believed* after the trust instrument was executed that the instrument gave a trustee the power to appoint a cotrustee, none of the trust language that Karin identified is reasonably susceptible to an interpretation that a trustee succeeding Raymond and Jeanne held such a power.  Under the circumstances, Karin failed to demonstrate that she was entitled to present extrinsic evidence in connection with the court's interpretation of the trust instrument.  (See *Russell*, *supra*, 69 Cal.2d at pp. 209, 211; *Kaila*, *supra*, 94 Cal.App.4th at p. 1133; *Dye*, *supra*, 92 Cal.App.4th at p. 978; *Curry*, *supra*, 40 Cal.App.4th at p. 1554.)

In sum, Karin failed to identify a patent ambiguity in the trust instrument concerning the power of an acting trustee to appoint a cotrustee.  She also failed to identify a latent ambiguity and articulate what type of extrinsic evidence would establish the latent ambiguity.  In the absence of ambiguity in the trust instrument regarding a trustee's power to appoint a cotrustee, Karin failed to demonstrate the need for extrinsic evidence on this issue of trust interpretation.

### 3. Evidentiary hearing

Karin contends that, because she was entitled to present extrinsic evidence regarding her construction of the trust instrument, the probate court should have held an evidentiary hearing to consider such evidence. As we have just explained, however, Karin failed to demonstrate that there was relevant and admissible extrinsic evidence concerning the proper construction of the trust instrument.

Karin also contends that she was entitled to an evidentiary hearing because the matter at issue – construction of the trust instrument – was contested.

In a proceeding under the Probate Code, "[a]n affidavit or verified petition shall be received as evidence when offered in an uncontested proceeding." (§ 1022.) On the other hand, "[w]hen a petition is contested, . . . 'affidavits and verified petitions may not be considered as evidence at a contested probate hearing.' [Citation.] Rather, absent a stipulation among the parties to the contrary, each allegation in a verified petition and each fact set forth in a supporting affidavit must be established by competent evidence.' [Citations.]" (*Estate of Lensch* (2009) 177 Cal.App.4th 667, 676 (*Lensch*).) Under that general rule, where a party opposing a motion in probate court requests an evidentiary hearing on the ground that there are "factual conflicts presented by the parties' competing declarations" (*Estate of Bennett* (2008) 163 Cal.App.4th 1303, 1309 (*Bennett*)), the trial court commits reversible error in denying the request for an evidentiary hearing (*id.* at pp. 1309-1310). (See also *Lensch*, *supra*, at pp. 676-677, 678.)

Relevant to this appeal, the contested issue between Karin's July 2013 petition initiating the action and Kathleen's November 2013 objection to the petition was whether Kathleen had the power to appoint and to revoke the appointment of Karin as cotrustee. Based on the parties' arguments in this case, the evidence relevant to the probate court's determination of the validity of the appointment or revocation under the trust was: (1) the trust instrument, (2) Jeanne's written resignation as trustee, (3) Kathleen's written designation of Karin as cotrustee, and (4) Kathleen's written

revocation of that designation. Copies of all these documents were attached to Karin's verified petition initiating the action, as well as to Kathleen's verified objection to the petition. Not surprisingly therefore, neither Karin nor Kathleen questioned the authenticity of these documents either below or on appeal. As we have explained, Karin failed to establish that the interpretation of the trust instrument required extrinsic evidence. Thus, the interpretation issue – including whether the trust instrument was ambiguous – presented only a question of law, and not a question of fact, for the probate court. (*Ike*, *supra*, 61 Cal.App.4th at p. 73; see *Colonial*, *supra*, 184 Cal.App.3d at p. 82.) In the absence of any material factual conflict arising from Karin's petition on the issue of the validity of the appointment or revocation under the trust, we find no basis for remanding the matter for an evidentiary hearing. (See *Lensch*, *supra*, 177 Cal.App.4th at pp. 676-677, 678; *Bennett*, *supra*, 163 Cal.App.4th at pp. 1309-1310; *Evangelho v. Presoto* (1998) 67 Cal.App.4th 615, 620-621.)

**B.** *Briefing Procedure*

Karin contends that the briefing procedure utilized by the probate court was improper. We do not find any of her contentions persuasive.

### 1. Lack of compliance with summary judgment motion procedures

Karin first contends that the briefing procedure did not comply with the requirements for a summary judgment motion.

Karin fails to articulate a persuasive argument as to why the probate court was required to follow the procedural requirements for a summary judgment motion under Code of Civil Procedure section 437c. The record does not reflect that either the parties or the court contemplated the matter being briefed, heard, or resolved pursuant to that section. Thus, not surprisingly, neither the parties nor the court followed the procedural requirements of that section. Instead, the parties briefed, and the probate court ruled on, whether an evidentiary hearing was needed in order to determine the validity of the revocation under the trust, and whether that issue should be bifurcated under Code of

22

Civil Procedure section 598.[5]  The briefing schedule was set pursuant to, and the parties followed, the timeframes generally applicable to motions.  (See Code Civ. Proc., § 1005, subd. (b).)  Karin fails to provide persuasive legal authority establishing that this process by the court was improper.

Moreover, although Karin observes that the procedures applicable to a summary judgment motion provide the parties with a longer briefing period and the opportunity to request a continuance in order to conduct discovery, the record on appeal does not reflect that Karin requested either a longer briefing period or a continuance to conduct discovery.

Karin observes that a party moving for summary judgment must file a separate statement of undisputed material facts.  She contends that she "was not placed on notice of the facts that Kathleen contended were undisputed."

We are not persuaded by Karin's lack of notice argument.  The purpose of the parties' briefing was to identify what, if any, factual conflict existed on the issue of the validity of the revocation under the trust, such that the probate court needed to hold an evidentiary hearing rather than deciding the issue as a matter of law.  It was clear from Kathleen's opening brief in the probate court that she believed *all* facts pertinent to the validity of the revocation and the construction of the trust instrument were undisputed and that therefore no evidentiary hearing was needed.  Indeed it was readily apparent from Kathleen's opening brief in the probate court that she considered the relevant

---

[5] Code of Civil Procedure section 598 states in part:  "The court may, when the convenience of witnesses, the ends of justice, or the economy and efficiency of handling the litigation would be promoted thereby, on motion of a party, after notice and hearing, make an order, no later than the close of pretrial conference in cases in which such pretrial conference is to be held, or, in other cases, no later than 30 days before the trial date, that the trial of any issue or any part thereof shall precede the trial of any other issue or any part thereof in the case, except for special defenses which may be tried first pursuant to Sections 597 and 597.5.  The court, on its own motion, may make such an order at any time."

undisputed facts to be: (1) the content of the trust instrument, (2) Jeanne's written resignation, (3) Kathleen's written designation of Karin as cotrustee, and (4) Kathleen's written revocation of the designation, as those four documents were the only pieces of relevant evidence specifically cited and discussed in the introduction and/or factual background of her opening brief.

Further, Karin never raised an objection below to the briefing process on the ground that the matter should be handled according to the procedures applicable to a summary judgment motion. Karin has therefore forfeited any claim that the court's briefing process essentially set up a motion for summary judgment that was brought without proper notice. (See *Pacific Std. Life Ins. Co. v. Tower Industries, Inc.* (1992) 9 Cal.App.4th 1881, 1887, 1888 (*Pacific*).)

Additionally, Karin fails to establish prejudice as a result of the briefing process utilized by the court. "[A]n appellant has the burden to show not only that the trial court erred but also that the error was prejudicial. [Citations.] Error is prejudicial if it is reasonably probable that a result more favorable to the appellant would have been reached absent the error. [Citations.]" (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 347-348 (*Red Mountain*).) As we explained above, Karin has failed to demonstrate that the trust instrument is reasonably susceptible to the interpretation that Kathleen had the power to appoint a cotrustee. Accordingly, if "this court remand[ed] the action to the trial court so that a so-called properly noticed motion for [summary] judgment could be brought," "the result would be the same because no triable issue of fact remains and judgment for [Kathleen] would, again, be the necessary result." (*Pacific*, *supra*, 9 Cal.App.4th at p. 1888.)

## 2. Court's ruling addressing appointment power rather than revocation power

Karin argues that it was improper for the probate court to determine that Kathleen lacked the power to *appoint* a cotrustee when Kathleen did not make this argument in her opening brief filed with the probate court.

24

As we set forth above, Kathleen argued in her opening brief in the probate court that section 2.2 of the trust provided the authority for her to *revoke* the cotrustee appointment of Karin.

In opposition, Karin contended that section 2.2 "does not provide" that she, as cotrustee, "may . . . be unilaterally removed by" the other cotrustee Kathleen. In particular, Karin argued that section 2.2 pertained to "the designation of a successor trustee." According to Karin, "[s]ection 2.2 thus provides that an acting Trustee who becomes 'unwilling or unable' to act may appoint his or her successor, and provides further that if the prior trustee again becomes willing and able to act, he or she may 'resume' that role." Karin contended that the trust was actually silent on the issue of whether she could be unilaterally removed as *cotrustee* by Kathleen.

In reply, Kathleen contended: "[B]y Karin's own reasoning, [Kathleen] had no power to appoint Karin as a 'co-Trustee' in the first place because Section 2.2 only gave [Kathleen] power to appoint a 'successor Trustee.' So taking Karin's argument to its logical extreme, the Court should void her appointment as 'co-Trustee' because such appointment was unauthorized. [¶] But the Court does not need to do that, for as we know the Court must construe the trust in a manner that serves 'the intent of the trustor' and that will 'give every expression some effect, rather than one that will render any of the expressions inoperative.' Here, the clear intent of the Revocation Provision [in section 2.2] is to preserve an appointed Trustee's power to revoke his or her later appointment of another Trustee. Whether that later-appointed Trustee is a 'successor Trustee' or a 'co-Trustee' is immaterial, and to strictly apply such a distinction to the present circumstances would subvert the intent of the trustor and render the Revocation Provision [in section 2.2] inoperative." (Fns. omitted.)

At the February 6, 2014 hearing on the matter, the probate court stated near the outset of the hearing that "[t]he clear reading of [section] 2.2 of the trust says nothing about a cotrustee." Shortly thereafter, the court expressed its belief that there was

25

"no authority in the trust itself for Kathleen to name Karin as cotrustee," and asked, "Shouldn't I just find it to be void in the inception and it never should have happened in the first place?" After hearing extensive argument from the parties, the court stated, "[T]he issue that we have today is, did Kathleen, A, have the authority to appoint Karin as cotrustee? I find she did not, and so Karin was never validly a costrustee. And so that's in the nature of a tentative ruling . . . ." After hearing further argument from the parties, the court stated its finding that Kathleen "didn't have the power to make the appointment in the first place, and so the power of revocation is sort of moot." In its subsequent written order, the court concluded that Kathleen's cotrustee appointment of Karin was "invalid and void since Section 2.2 of the Trust does not provide for the appointment of a 'Co-Trustee' and only provides for appointment of a 'successor Trustee.' " (Italics omitted.)

The record reflects that the probate court *adopted* a construction of the trust that was initially *raised by Karin*, that is, section 2.2 pertains to a trustee's power to appoint and revoke the appointment of a *successor* trustee and the section does not address a trustee's powers with respect to a *cotrustee*. We therefore are not persuaded by Karin's argument on appeal that she was "deprived of [the] ability to respond to the new ground" raised in Kathleen's reply brief that was filed in the probate court.

Further, the probate court clearly indicated from the outset of the February 6, 2014 hearing that it was concerned about Kathleen's power to *appoint* a cotrustee, as a matter preliminary to the issue of whether she also had the power to *revoke* the appointment. Karin had ample opportunity at the hearing to object to the court raising the preliminary issue of Kathleen's power to appoint. Although Karin offered substantive arguments at the hearing, she never raised any procedural objection to the court's consideration of the appointment issue and she never requested a continuance for further opportunity to brief or argue the appointment issue.

26

" '[I]t is well settled that the appearance of a party at the hearing of a motion and his or her opposition to the motion on its merits is a waiver of any defects or irregularities in the notice of the motion. [Citations.] This rule applies even when no notice was given at all. [Citations.] Accordingly, a party who appears and contests a motion in the court below cannot object on appeal or by seeking extraordinary relief in the appellate court that he had no notice of the motion or that the notice was insufficient or defective.' [Citations.]" (*Reedy v. Bussell* (2007) 148 Cal.App.4th 1272, 1288 (*Reedy*).)

For example, in *Kowalski v. Cohen* (1967) 252 Cal.App.2d 977 (*Kowalski*), the plaintiff argued on appeal that the defendants failed to give proper notice of a motion to dismiss the complaint on the basis of a discretionary two-year provision of a statute. (*Id.* at p. 979.) The notice of motion identified only a five-year provision of the statute. (*Ibid.*) However, the plaintiff had appeared at the hearings on the motion, both periods of limitation were argued by the plaintiff, and the plaintiff did not make any objection based on lack of notice. The appellate court determined that the "[p]laintiff's appearance and participation at the hearings operated as a waiver of any objections he may have had predicated upon an asserted lack of notice [citation]." (*Ibid.*)

When an appellate court refuses to consider procedural defects or erroneous rulings where an objection could have been, but was not, made in the trial court, the explanation is " ' " '[o]ften . . . that it is *unfair to the trial judge and to the adverse party* to take advantage of an error on appeal when it could easily have been corrected at the trial.' [Citation.]" [Citations.] [¶] Moreover, it would be inappropriate to allow a party not to object to an error of which the party is or should be aware, " 'thereby permitting the proceedings to go to a conclusion which he [or she] may acquiesce in, if favorable, and which he [or she] may avoid, if not.' [Citation.]" [Citation.]' " (*In re Carrie W.* (2003) 110 Cal.App.4th 746, 755.)

In this case, the probate court made clear at the February 6, 2014 hearing that it was considering the preliminary question of whether Kathleen had the power to *appoint* a

27

cotrustee before reaching the issue of whether Kathleen also had the power to *revoke* the cotrustee's designation. Karin never objected to the court's consideration of the appointment issue. In fact, she argued the merits of the appointment issue, which was inextricably tied to the cotrustee revocation issue. Under the circumstances, Karin has forfeited any objection to the court's consideration of the cotrustee appointment issue based on inadequate notice. (*Reedy*, *supra*, 148 Cal.App.4th at p. 1288; *Kowalski*, *supra*, 252 Cal.App.2d at p. 979.)

Moreover, even assuming it was error for the probate court to reach the preliminary issue of Kathleen's power of appointment instead of only addressing her power to revoke an appointment, Karin fails to demonstrate prejudice. "In order to obtain a reversal based upon such a procedural flaw [as inadequate notice], the appellant must demonstrate not only that the notice was defective, but that he or she was *prejudiced*. [Citations.]" (*Reedy*, *supra*, 148 Cal.App.4th at p. 1289; see *Red Mountain*, *supra*, 143 Cal.App.4th at pp. 347-348.) As we have explained, Karin fails to identify any language in the trust instrument that is reasonably susceptible to an interpretation that a trustee has the power to appoint a cotrustee.

### 3. Scope of briefing

Karin contends that the probate court, in making its ruling, ruled on an issue that was broader than the issue that it had ordered the parties to brief. In particular, Karin argues that the court initially sought briefing on whether the validity of the cotrustee revocation was a purely legal issue that could be resolved without extrinsic evidence. She contends that the court did not simply rule on whether extrinsic evidence was necessary, but also proceeded to make a determination as to the proper construction of the trust instrument.

The probate court set a briefing schedule for a hearing on whether the matter could be resolved without extrinsic evidence. The court stated: "I'm inclined to . . . have the parties brief the threshold issue which is, does the validity of revocation in fact present a

28

purely legal issue that can be resolved without extrinsic evidence? And I'll give you a hearing date which will just be for argument on the briefs that you've submitted on those issues and then depending how that comes out, we'll either have a more fully blown evidentiary hearing with extrinsic evidence or it's going to be resolved as a purely legal issue."

After receiving written briefs and hearing argument from the parties, the court determined that, pursuant to Code of Civil Procedure section 598, it was "efficient and appropriate" to bifurcate the issue of whether Kathleen had the power to revoke the cotrustee status of Karin. The court stated that its finding was that Kathleen "didn't have the power to make the appointment in the first place, and so the power of revocation is sort of moot." In its written order, the court explained that the issue of the application of the trust to the appointment and revocation of appointment was "appropriate for bifurcation," and that it "may consider this matter without the need for extrinsic evidence." The court determined that the cotrustee appointment was "invalid and void since Section 2.2 of the Trust does not provide for the appointment of a 'Co-Trustee' and only provides for appointment of a 'successor Trustee.' " (Italics omitted.) The court confirmed Kathleen as the sole trustee, based on section 2.1 of the trust and Jeanne's resignation.

The record thus reflects that the probate court initially sought briefing on the issue of whether the validity of the cotrustee revocation by Kathleen "present[ed] a purely legal issue that [could] be resolved without extrinsic evidence." Significantly, the court also stated to the parties that "depending how that comes out, *we'll either have a more full blown evidentiary hearing with extrinsic evidence or it's going to be resolved as a purely legal issue*." (Italics added.)

In order to properly address whether the validity of the revocation could be resolved as a matter of law and without extrinsic evidence, the parties necessarily had to, and did, make arguments in their briefs and orally at the hearing about the proper

29

construction of the trust. After receiving the parties' arguments and determining that extrinsic evidence was not necessary, the court proceeded to interpret the trust on the issue of the validity of the cotrustee appointment and revocation. Although Karin contends that the matter should have been set for *further* briefing on the proper interpretation of the trust upon the court determining that extrinsic evidence was not necessary, it is apparent that the court contemplated and conveyed to the parties when the briefing schedule was originally set that a ruling on the interpretation issue might occur without the need for further hearing if it was "going to be resolved as a purely legal issue."

Even assuming the probate court should have provided Karin with the opportunity for further briefing on the legal issue of the proper interpretation of the trust, Karin fails on appeal to persuasively articulate a construction of the trust that would have resulted in a different result, that is, a construction of the trust that gave Kathleen the power to appoint a cotrustee. Accordingly, Karin fails to show prejudice from the court's failure to allow further briefing. (*Reedy*, *supra*, 148 Cal.App.4th at p. 1289; *Red Mountain*, *supra*, 143 Cal.App.4th at pp. 347-348.)

In sum, we conclude that Karin's claims of error regarding the briefing procedure do not warrant remand of the matter.

## IV. DISPOSITION

The March 7, 2014 order is affirmed. The parties shall bear their own costs on appeal.

30

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MIHARA, J.

*Freuler v. Freuler*
**H041000**